Steven D. PRATT, Plaintiff,

v.

FIRST HAYS BANSHARES, INC., Defendant.

Civ. A. No. 87–2575–S.

United States District Court, D. Kansas.

April 7, 1988.

Alan V. Johnson, Martha A. Peterson, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, Kan., for plaintiff.

Jack E. Dalton, Michael A. Doll, Mangan, Dalton, Trenkle, Rebein & Doll, Ctd., Dodge City, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendant's motion to dismiss. Defendant states several grounds for dismissal, including lack of subject matter jurisdiction, no case or controversy, failure to join an indispensable party, lack of real party standing, and existence of an identical pending state court action. Defendant also requests oral argument on its motion. The court has determined that oral argument would not be of material assistance in the determination of this matter. Rule 206(d), Rules of Practice of the United States District Court for the District of Kansas. The court will therefore proceed to dispose of defendant's motion.

■ This action arises out of a million dollar fraud committed upon the First National Bank of Hays, Kansas by one of its former directors, plaintiff Steve Pratt. The parties have submitted court records, deposition testimony, documents, and affidavits in support of their arguments. The court may properly consider such matters outside the pleadings on a motion to dismiss for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1); defendant's Rule 12(b)(1) motion will be dispositive, and the uncontroverted facts for purposes of that motion therefore are as follows.

Plaintiff Steve Pratt ("Pratt") was a director of the First National Bank of Hays, Kansas ("First National") during all times relevant to this motion. He was also elected to serve on two bank committees in February 1984. Defendant First Hays Banshares, Inc. ("FHB") is a Kansas corporation which previously owned approximately 88 percent of the common stock in First National. Kansas Bankers Surety Company ("KBS") is a Kansas insurance company which issued two banker blanket bonds to First National and FHB. The bonds insured against losses caused to the insureds by the fraud and dishonesty of directors of the bank while they acted as members of any bank committee. From November 1984 through July 1985, Pratt engaged in a fraudulent and dishonest scheme which caused First National a loss

of over $1.5 million.[1] This fraud was discovered on July 17, 1985, and reported to KBS on July 23, 1985. On August 13, 1985, KBS denied coverage.

Approximately one month later, First National and four other creditors entered into a settlement agreement (" '85 agreement") with Pratt and his family. In that agreement, First National released all claims against Pratt in exchange for payments to be made by Pratt's father, Don Pratt. First National also promised to pay back to Pratt any amount it received from KBS in the future as a result of the loss report given in July 1985. In October 1985, First National assigned to FHB all its right, title and interest in the September '85 agreement.

In June, 1986, FHB filed suit against KBS in the District Court of Ford County, Kansas, alleging KBS was obligated to provide coverage for the loss reported in July 1985. KBS joined Steve and Don Pratt as third-party defendants in the action. On December 14, 1987, that case went to trial, and four days later, a jury returned a verdict in favor of FHB for over $5.2 million.

The third-party claim in that action had been settled just a few weeks earlier. On October 27, 1987, Pratt and KBS entered into a settlement agreement (" '87 agreement"); Pratt agreed to indemnify KBS for any amount of damages recovered from KBS by FHB in the Ford County suit in exchange for an agreement by KBS to dismiss the third-party claim against the Pratts. Pratt also authorized KBS to institute suit or make claim against all parties liable to [Steve Pratt] by virtue of the ['85] agreement in his name and stead, provided always, that such litigation or claims shall be at the sole expense of [KBS]. In a separate security agreement, Pratt granted KBS a security interest in all of his rights under the '85 agreement. KBS dismissed the third-party claim on November 12, 1987.

On November 24, 1987, the present declaratory judgment action was commenced.

Pratt seeks an adjudication of his right to recover from FHB under the '85 agreement. He claims that pursuant to that agreement, FHB must pay him any amounts it receives from KBS as a result of the Ford County litigation. KBS has brought this action in Pratt's name pursuant to the '87 agreement. It is prosecuted by KBS' attorneys and the course of the litigation so far has been controlled by KBS. Pratt participates in this litigation in name only.

■ The parties first dispute Pratt's citizenship for purposes of diversity. Defendant claims Pratt is a citizen of Kansas, and that diversity jurisdiction is therefore lacking. Pratt claims he is a citizen of Washington. Since FHB is a Kansas corporation, diversity jurisdiction is lacking unless Pratt is a Washington citizen. *See* 28 U.S. C. § 1332(a)(1). The party asserting that diversity of citizenship exists carries the burden of proof on that issue. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936).

The court must look to additional facts submitted by the parties in the form of affidavits and deposition testimony to determine Pratt's citizenship. Defendant points to the fact that Washington is simply the place of plaintiff's incarceration; in July 1987, Pratt was sentenced to a six-month term of imprisonment at the Conquest Center in Edmonds, Washington after he pled guilty to a one-count information, *see* n. 1, *supra.* As a general rule, a prisoner incarcerated in a state other than his domicile will continue to retain his pre-incarceration domicile. *Jones v. Hadican*, 552 F.2d 249, 250 (8th Cir.), *cert. denied*, 431 U.S. 941, 97 S.Ct. 2658, 53 L.Ed.2d 260 (1977). Therefore, defendant argues, Pratt is still a citizen of Kansas and diversity is lacking.

However, the uncontroverted facts show that Pratt moved from Hays, Kansas to the State of Washington in late 1985. He obtained a Washington driver's license in No-

---

**1.** He later was charged with one count of bank fraud, 18 U.S.C. § 1344, pled guilty and was sentenced.

vember 1985, and purchased a home in Bellevue, Washington in December 1985. Pratt's wife began employment in Bellevue in November 1985, and he began working in March 1986. He has visited Kansas four times since leaving in 1985, and each visit was for the purpose of dealing with legal matters. The court finds that this evidence is sufficient to sustain plaintiff's burden on the issue of diversity. Therefore, diversity exists unless Pratt's presence in this lawsuit violates 28 U.S.C. § 1359.

■ Defendant contends that Pratt is not the real party in interest, and that KBS is the only party with a true stake in this litigation. FHB contends that by agreeing in the '87 agreement that KBS could bring this action in Pratt's name, and by subsequently bringing this lawsuit in his name rather than in KBS' name, diversity has been "manufactured" in violation of 28 U.S.C. § 1359.

Section 1359 of Title 28 U.S.C. provides that:

A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court.

Defendant charges that the settlement and security agreements between KBS and Pratt were collusive and intended only to ensure diversity jurisdiction in the present action. When a defendant charges a transaction was collusive in violation of 28 U.S.C. § 1359, the burden of proof is on the plaintiff to show a legitimate purpose behind the transaction. *Bradbury v. Dennis*, 310 F.2d 73, 74 (10th Cir.1962), *cert. denied*, 372 U.S. 928, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963).

Several courts have interpreted Section 1359. The United States Supreme Court addressed the provision in *Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969). In that case, a Haitian corporation contracted to purchase stock from a Panamanian corporation. The Haitian company failed to make the payments as due. The Panamanian corpora-

tion assigned its interest in the contract to a Texas attorney for consideration of $1.[2] In a separate agreement, the attorney agreed to pay the Panamanian company 95% of any recovery obtained from the Haitian corporation. The Court held that an assignment of a contractual interest to a diverse party for purposes of collection only was improper and collusive in violation of Section 1359. *Id.* at 827–28, 89 S.Ct. at 1489. This was so even though the assignment was valid under state law. *Id.* at 829, 89 S.Ct. at 1490. The Court said that the purpose of Section 1359 was "to prevent the manufacture of Federal jurisdiction by the device of assignment." *Id.* at 826, 89 S.Ct. at 1489 (quoting Revisor's Note, 28 U.S.C. § 1359).

Several circuits later analyzed Section 1359 in cases involving attempted assignments in light of *Kramer*. In *Prudential Oil Corp. v. Phillips Petroleum Co.*, 546 F.2d 469 (2d Cir.1976), a non-diverse parent corporation had assigned its claim against the defendant to a newly-created diverse subsidiary; the subsidiary held no other assets, and its sole purpose for existence was to prosecute the assigned claim. Prosecution of the claim was conducted wholly in the parent corporation's interest and under the sole direction of the parent's chief executive. The court held that the suit violated section 1359. *Id.* at 477.

Other courts have arrived at similar holdings after a non-diverse party has assigned its claim to a diverse party; *see, e.g., Bishop v. Hendricks*, 495 F.2d 289 (4th Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 639, 42 L.Ed.2d 653 (1974); *Rogers v. Bates*, 431 F.2d 16 (8th Cir.1970); *O'Brien v. Avco Corp.*, 425 F.2d 1030 (2d Cir.1969). Although the Tenth Circuit has not had occasion to address section 1359 in the context of a claim assignment, it has addressed the statute after a defendant in a wrongful death case questioned the motivation for appointing a diverse personal representative to prosecute the action. *See Martinez v. United States Olympic Committee*, 802 F.2d 1275 (10th Cir.1986). That case held

---

**2.** There is no diversity of citizenship in a suit between foreign citizens. 28 U.S.C. § 1332;

*Kramer*, 394 U.S. at 824, n. 2, 89 S.Ct. at 1488, n. 2.

that a court should inquire into the motive of those involved in the transaction which created the diversity, and that the burden of proof was on the party invoking the jurisdiction of the court. *Id.* at 1279.

Before we move on to the facts of this case, the court notes the admonition of the Second Circuit in *Prudential.* That court discussed the origins of 28 U.S.C. § 1332, and noted that:

> The reason for mandating careful examination of ... assignments has been clear: such devices, unless controlled, can provide a simple means of expanding federal diversity jurisdiction far beyond the purpose of the Founding Fathers, which was simply to provide an impartial forum for out-of-state parties who might be subject to prejudice in local state court.

*Prudential,* 546 F.2d at 474. The court also noted that with the advent of television, radio, telephones, and modern transportation, the boundaries between states are not as significant as they were at the time section 1332 was first drafted. As a result, there is probably little danger today that a party from another state would suffer actual prejudice simply because of citizenship. Therefore, section 1359 should be interpreted broadly to prevent further expansion of diversity jurisdiction. Finally, the court is admonished that "[f]ederal courts are bound to be especially cautious in the exercise of their diversity jurisdiction, which because of its concurrent nature in matters involving questions of state law, creates a peculiar risk that the proper boundaries of judicial power will be overlooked." *Dougherty v. Oberg,* 297 F.Supp. 635, 636–37 (D.Minn.1969).

Keeping these policies in mind, along with the language of section 1359 and the relevant case law, we now move to examine the facts before us. The facts here do not parallel those of other section 1359 cases arising out of assignments. In previous cases, a non-diverse party has assigned its claim to a diverse party in an effort to get into federal court. In the present case, we have nearly the opposite situation: a full assignment of Pratt's claim here would have *destroyed* diversity. Pratt provided to KBS the right to receive all amounts recovered against FHB in this lawsuit. KBS also has the right to bring this lawsuit and to control it. As was the case in *Prudential,* KBS attorneys are prosecuting this case, KBS is paying all costs of the litigation, and it appears KBS officials are calling the shots. Pratt admitted in his deposition that he has taken no part in the prosecution of this case. He is truly here in name only.

Pratt has failed to meet his burden of proof here and show the court any legitimate, unrelated reason for turning over in the '87 agreement all rights except his name. In fact, the court is left with the definite impression that the only reason the transaction was arranged in this fashion was so KBS could get into federal court. This theory seems especially plausible when we examine the course of the Ford County litigation. In that case, KBS sought summary judgment on a "circle of indemnity" theory, and tried to argue it was not liable to FHB on this theory. The court need not expound on this argument here. We only need note that KBS appears to be seeking to avoid the Ford County court and to complete the "circle" by getting back at least a portion of the amounts owed under the Ford County judgment, through a clever settlement agreement with Pratt. A Ford County jury found that KBS should pay FHB pursuant to its July 1985 loss report. FHB in turn is allegedly required to pay this amount to Pratt pursuant to the '85 agreement. Through this suit and its '87 agreement with Pratt, KBS now seeks to get that same amount back. Pratt avoids the trouble of further litigation, and FHB is left only with the amounts paid to it by Don Pratt under the '85 agreement.

The court is left with little choice but to dismiss this case for lack of subject matter jurisdiction. Section 1359 is to be interpreted broadly so as to avoid overstepping the boundaries of this court's jurisdiction. The only parties active in this case are all Kansas citizens. Pratt has failed to meet his burden in showing the '87 settlement transaction was not collusive or improper in violation of section 1359. Therefore, the

court will dismiss the action. In so doing, the court reserves all comment on whether Pratt should prevail in a parallel state action, if filed. This decision also makes it unnecessary for the court to address defendant's other alleged grounds for dismissal.

IT IS BY THE COURT THEREFORE ORDERED that defendant's motion to dismiss is granted.